# TEXAS *v.* UNITED STATES

No. 97–29.   Argued January 14, 1998—Decided March 31, 1998

SCALIA, J., delivered the opinion for a unanimous Court.

*Javier Aguilar*, Special Assistant Attorney General of Texas, argued the cause for appellant. With him on the briefs were *Dan Morales*, Attorney General, *Jorge Vega*, First Assistant Attorney General, and *Deborah A. Verbil*, Special Assistant Attorney General.

*Paul R. Q. Wolfson* argued the cause for the United States. With him on the brief were *Solicitor General Waxman, Acting Assistant Attorney General Pinzler, Deputy Solicitor General Wallace, Mark L. Gross*, and *Miriam R. Eisenstein.*[*]

JUSTICE SCALIA delivered the opinion of the Court.

Appellant, the State of Texas, appeals from the judgment of a three-judge District Court for the District of Columbia. The State had sought a declaratory judgment that the pre-clearance provisions of § 5 of the Voting Rights Act of 1965, 79 Stat. 439, as amended, 42 U. S. C. § 1973c, do not apply to implementation of certain sections of the Texas Education Code that permit the State to sanction local school districts for failure to meet state-mandated educational achievement levels. This appeal presents the question whether the controversy is ripe.

I

In Texas, both the state government and local school districts are responsible for the public schools. There are more than 1,000 school districts, each run by an elected school board. In 1995, the Texas Legislature enacted a

---

[*]*Daniel J. Popeo* filed a brief for the Washington Legal Foundation et al. as *amici curiae* urging reversal.

*Pamela S. Karlan, Laughlin McDonald, Neil Bradley, Cristina Correia, Elaine R. Jones, Theodore M. Shaw, Norman J. Chachkin, Jacqueline Berrien, Victor A. Bolden*, and *Steven R. Shapiro* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

comprehensive scheme (Chapter 39) that holds local school boards accountable to the State for student achievement. Tex. Educ. Code Ann. §§ 39.021–39.131 (1996). Chapter 39 contains detailed prescriptions for assessment of student academic skills, development of academic performance indicators, determination of accreditation status for school districts, and imposition of accreditation sanctions. It seeks to measure the academic performance of Texas schoolchildren, to reward the schools and school districts that achieve the legislative goals, and to sanction those that fall short.

When a district fails to satisfy the State's accreditation criteria, the State Commissioner of Education may select from 10 possible sanctions that are listed in ascending order of severity. §§ 39.131(a)(1)–(10). Those include, "to the extent the [C]ommissioner determines necessary," § 39.131(a), appointing a master to oversee the district's operations, § 39.131(a)(7), or appointing a management team to direct the district's operations in areas of unacceptable performance or to require the district to contract for services from another person, § 39.131(a)(8). When the Commissioner appoints masters or management teams, he "shall clearly define the[ir] powers and duties" and shall review the need for them every 90 days. § 39.131(e). A master or management team may approve or disapprove any action taken by a school principal, the district superintendent, or the district's board of trustees, and may also direct them to act. §§ 39.131(e)(1), (2). State law prohibits masters or management teams from taking any action concerning a district election, changing the number of members on or the method of selecting the board of trustees, setting a tax rate for the district, or adopting a budget which establishes a different level of spending for the district from that set by the board. §§ 39.131(e)(3)–(6).

Texas is a covered jurisdiction under § 5 of the Voting Rights Act of 1965, see 28 CFR pt. 51, App. (1997), and consequently, before it can implement changes affecting vot-

ing it must obtain preclearance from the United States District Court for the District of Columbia or from the Attorney General of the United States. 42 U. S. C. §1973c. Texas submitted Chapter 39 to the Attorney General for administrative preclearance. The Assistant Attorney General* requested further information, including the criteria used to select special masters and management teams, a detailed description of their powers and duties, and the difference between their duties and those of the elected boards. The State responded by pointing out the limits placed on masters and management teams in §39.131(e), and by noting that the actual authority granted "is set by the Commissioner at the time of appointment depending on the needs of the district." App. to Juris. Statement 99a. After receiving this information, the Assistant Attorney General concluded that the first six sanctions do not affect voting and therefore do not require preclearance. He did not object to §§39.131(a)(7) and (8), insofar as the provisions are "enabling in nature," but he cautioned that "under certain foreseeable circumstances their implementation may result in a violation of Section 5" which would require preclearance. *Id.*, at 36a.

On June 7, 1996, Texas filed a complaint in the United States District Court for the District of Columbia, seeking a declaration that §5 does not apply to the sanctions authorized by §§39.131(a)(7) and (8), because (1) they are not changes with respect to voting, and (2) they are consistent with conditions attached to grants of federal financial assistance that authorize and require the imposition of sanctions to ensure accountability of local education authorities. The District Court did not reach the merits of these arguments because it concluded that Texas's claim was not ripe. We noted probable jurisdiction. 521 U. S. 1150 (1997).

*The authority for determinations under §5 has been delegated to the Assistant Attorney General for the Civil Rights Division. 28 CFR §51.3 (1997).

## II

A claim is not ripe for adjudication if it rests upon "'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Thomas* v. *Union Carbide Agricultural Products Co.*, 473 U. S. 568, 580–581 (1985) (quoting 13A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3532, p. 112 (1984)). Whether Texas will appoint a master or management team under §§ 39.131(a)(7) and (8) is contingent on a number of factors. First, a school district must fall below the state standards. Then, pursuant to state policy, the Commissioner must try first "the imposition of sanctions which do not include the appointment of a master or management team," App. 10 (Original Complaint ¶ 12). He may, for example, "order the preparation of a student achievement improvement plan . . . , the submission of the plan to the [C]ommissioner for approval, and implementation of the plan," § 39.131(a)(3), or "appoint an agency monitor to participate in and report to the agency on the activities of the board of trustees or the superintendent," § 39.131(a)(6). It is only if these less intrusive options fail that a Commissioner may appoint a master or management team, Tr. of Oral Arg. 16, and even then, only "to the extent the [C]ommissioner determines necessary," § 39.131(a). Texas has not pointed to any particular school district in which the application of § 39.131(a)(7) or (8) is currently foreseen or even likely. Indeed, Texas hopes that there will be no need to appoint a master or management team for any district. Tr. of Oral Arg. 16–17. Under these circumstances, where "we have no idea whether or when such [a sanction] will be ordered," the issue is not fit for adjudication. *Toilet Goods Assn., Inc.* v. *Gardner*, 387 U. S. 158, 163 (1967); see also *Renne* v. *Geary*, 501 U. S. 312, 321–322 (1991).

Even if there were greater certainty regarding ultimate implementation of paragraphs (a)(7) and (a)(8) of the statute, we do not think Texas's claim would be ripe. Ripeness "re-

quir[es] us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 149 (1967). As to fitness of the issues: Texas asks us to hold that under no circumstances can the imposition of these sanctions constitute a change affecting voting. We do not have sufficient confidence in our powers of imagination to affirm such a negative. The operation of the statute is better grasped when viewed in light of a particular application. Here, as is often true, "[d]etermination of the scope . . . of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function." *Longshoremen* v. *Boyd*, 347 U. S. 222, 224 (1954). In the present case, the remoteness and abstraction are increased by the fact that Chapter 39 has yet to be interpreted by the Texas courts. Thus, "[p]ostponing consideration of the questions presented, until a more concrete controversy arises, also has the advantage of permitting the state courts further opportunity to construe" the provisions. *Renne*, *supra*, at 323.

And as for hardship to the parties: This is not a case like *Abbott Laboratories* v. *Gardner*, *supra*, at 152, where the regulation at issue had a "direct effect on the day-to-day business" of the plaintiffs, because they were compelled to affix required labeling to their products under threat of criminal sanction. Texas is not required to engage in, or to refrain from, any conduct, unless and until it chooses to implement one of the noncleared remedies. To be sure, if that contingency should arise compliance with the preclearance procedure could delay much needed action. (Prior to this litigation, Texas sought preclearance for the appointment of a master in a Dallas County school district, and despite a request for expedition the Attorney General took 90 days to give approval. See Brief for Appellant 37, n. 28.) But even that inconvenience is avoidable. If Texas is confident that

the imposition of a master or management team does not constitute a change affecting voting, it should simply go ahead with the appointment. Should the Attorney General or a private individual bring suit (and if the matter is as clear, even at this distance, as Texas thinks it is), we have no reason to doubt that a district court will deny a preliminary injunction. See *Presley* v. *Etowah County Comm'n*, 502 U. S. 491, 506 (1992); *City of Lockhart* v. *United States*, 460 U. S. 125, 129, n. 3 (1983). Texas claims that it suffers the immediate hardship of a "threat to federalism." But that is an abstraction—and an abstraction no graver than the "threat to personal freedom" that exists whenever an agency regulation is promulgated, which we hold inadequate to support suit unless the person's primary conduct is affected. Cf. *Toilet Goods Assn.*, *supra*, at 164.

In sum, we find it too speculative whether the problem Texas presents will ever need solving; we find the legal issues Texas raises not yet fit for our consideration, and the hardship to Texas of biding its time insubstantial. Accordingly, we agree with the District Court that this matter is not ripe for adjudication.

The judgment of the District Court is affirmed.

*It is so ordered.*